

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2016 FEB -5  AM 11:46

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA;
STATE OF FLORIDA;
ex rel. STEPHEN VANASCO,

Plaintiffs

Case No.:  8:16-CV-288-T-33 TGW

v.

AHP OF ORLANDO, LLC, a Florida limited liability
company; AMSURG CORP., a Tennessee and Florida
corporation;   AMSURG   HOLDINGS,   INC.,   a
Tennessee,   Delaware   and   Florida   corporation;
ANESTHESIA HEALTHCARE PARTNERS, INC., a
Nevada, Georgia and Florida corporation; CENTRAL
FLORIDA SURGICAL CENTERS, INC., a Florida
profit corporation; ORLANDO FL ENDOSCOPY ASC,
LLC., a Tennessee and Florida limited liability
company,   CITRUS   AMBULATORY   SURGERY
CENTER, INC., a Florida corporation, AVANISH M.
AGGARWAL, MD., an individual; ROBERT T.
BAKER, MD., an individual; STEVEN L BRINT, MD.,
an individual; RICHARD A. DUMOIS, MD., an
individual; KENNETH R. FEUER, an individual;
ALEX M. MENENDEZ, MD., an individual and JOHN
AND JANE DOE DEFENDANTS 1-100,

Defendants

**FILED IN CAMERA AND
UNDER SEAL PURSUANT
TO THE FALSE CLAIMS
ACT, 31 U.S.C. § 3729 *et seq.***

---

## *QUI TAM* ACTION

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
## AND DEMAND FOR JURY TRIAL

## FILED UNDER SEAL



1

1.      Under the federal False Claims Act and the states false claims acts, as defined and more specifically listed below, this complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60) days after it received the Complaint.

2.      As required by the False Claims Act, Relator voluntarily submitted prior to the filing of this complaint, a confidential written disclosure statement (subject to the attorney-client and common interest privileges to the United States Government containing material evidence and information in her possession pertaining to the allegations contained in this complaint.

## INTRODUCTION

3.      This case involves fraudulent arrangements whereby physician owners of ambulatory surgery centers ("ASC") enter into "joint ventures" in which the physicians are paid kickbacks from fees generated for anesthesia services for their referral of patients.

4.      The ASC owners use different models to perpetrate the foregoing, all of which are in violation of the law.

## ORIGINAL SOURCE STATEMENT

5.      Relator is the original source of the information underlying the allegations contained in this Complaint. 31 U.S.C. §3730(e)(4)(A), and (B).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act pursuant to 28 U.S.C. §1345 and which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America pursuant to 28 U.S.C. §1331.

7.      The acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein were performed by the Defendants who transact business and reside in this district. Therefore, this Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to 31 U.S.C. §3732(a).

8.      Further, this Court has jurisdiction, under 31 U.S.C. §3732(b), over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under §3732.

9.      Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because the Defendants are subject to personal jurisdiction in this District and transact business in this District.

10.     The Florida FCA claims are filed pendent to the federal claims filed herein and pursuant to Fla. Stat. Ann. §68.081 *et seq.*

## PARTIES

11.     Relator Stephen Vanasco D.O. (hereafter referred to as "Relator") is a board certified anesthesiologist in Florida who worked as an anesthesiologist for AHP of Orlando, LLC, which is owned by Anesthesia Health Partners, Inc.

12.    At all times relevant to this complaint Relator resided at 6146 Crystal View Dr., Orlando, FL 32819.

13.    Defendant AHP OF ORLANDO, LLC (hereafter referred to as "AHP LLC") is a Florida limited liability company with its principal address at 4411 Suwanee Dam Rd., Ste 250, Suwanee, GA 30024.

14.    Defendant AMSURG CORP. (hereafter referred to as "Amsurg Corp.") is a for-profit corporation organized under the laws of Tennessee with its principal address a 1A Burton Hills Blvd., Nashville, TN 37215.

15.    Defendant AMSURG HOLDINGS, INC. (hereafter referred to as "Amsurg Holdings") is a for-profit corporation organized under the laws of Tennessee and Delaware with its principal address at 1A Burton Hills Blvd., Nashville, TN 37215.

16.    Defendant ANESTHESIA HEALTHCARE PARTNERS, INC. (hereafter referred to as "AHP Inc.") is a Nevada corporation, registered in Georgia which has the principal address of 3079 Peachtree Industrial Blvd, Duluth, GA 30097.

17.    Defendant ORLANDO FL ENDOSCOPY ASC, LLC and/or THE ORLANDO FL ENDOSCOPY ASC, LLC (hereafter referred to as "Orlando Endoscopy") is a Tennessee limited liability company registered in Florida with a principal address of 1A Burton Hills Blvd., Nashville, TN 3715.

18.    Defendant Orlando Endoscopy is the owner of the fictitious names registered in Florida to do business as "Central Florida Surgical Center" and "Citrus Ambulatory Surgery Center" (hereafter referred to individually as "Central ASC" and "Citrus ASC" respectively

4

and collectively as the "ASCs"), with a mailing address of 20 Burton Hills Blvd., 5th Fl., Nashville, TN 37215.

19.     Defendant CITRUS AMBULATORY SURGERY CENTER, INC. is an active corporation in the State of Florida with a principal address of 2861 S. Delaney Avenue, Suite B, Orlando, FL 32806 in the middle district of Florida.

20.     Defendant CENTRAL FLORIDA SURGICAL CENTERS, INC., (hereafter referred to as "CFSC") is a for profit corporation organized under Florida law with a principal address of 11140 W. Colonial Drive., Ste 3, Ocoee, FL 34761.

21.     At all times relevant to this complaint the ASCs described herein, Central ASC and Citrus ASC, were owned by Amsurg Corp. (51%) and CFSC. (49%).

22.     Defendant AVANISH M. AGGARWAL, MD., is a gastroenterologist and an owner/member of Citrus Ambulatory Surgical Center and Central Florida Surgical Center.

23.     Defendant ROBERT T. BAKER, MD., is a gastroenterologist and an owner/member of Citrus Ambulatory Surgical Center and Central Florida Surgical Center,

24.     Defendant STEVEN L. BRINT, MD., is a gastroenterologist and an owner/member of Central Florida Surgical Center.

25.     Defendant RICHARD A. DUMOIS, MD., is a gastroenterologist and an owner/member of Central Florida Surgical Center.

26.     Defendant KENNETH R. FEUER, MD., is a gastroenterologist and an owner/member of Central Florida Surgical Center and Citrus Ambulatory Surgical Center.

27.     Defendant ALEX M. MENENDEZ, MD., is a gastroenterologist and an owner/member of Citrus Ambulatory Surgical Center,

28.     Defendants JOHN AND JANE DOE DEFENDANTS 1-100 include other ASCs and their physician owners who have been participating in the schemes set forth below.

## REGULATORY FRAMEWORK

<u>Federal False Claims Act</u>

29.     A cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. §3729(a)(1)(A).

30.     Liability also arises when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. §3729(a)(1)(B).

31.     As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is necessary. *Id.*

32.     Pursuant to the §3729(a)(1)(G) of the FCA, a cause of action arises when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

33.    FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.

34.    The *qui tam* provision of the FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government.

35.    A FCA complaint is filed under seal and without service on the defendants and remains under seal while the government conducts an investigation of the allegations in the Complaint and determines whether to join the action.

<u>Florida False Claims Act</u>

36.    The Florida FCA provides that any person who knowingly makes, uses, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state is liable for the full amount of damages incurred by the State due to the false statement, and for each claim a civil penalty of not less than $5,500.00 or more than $11,000.00 plus triple the amount of damages suffered by the state as a result of the conduct.  Fla. Stat. Ann. § 68.082(2).

37.    Similar to the federal False Claims Act, the Florida Act provides a cause of action for an individual to bring a cause of action, on behalf of the State of Florida, and against defendants for false and/or fraudulent claims. Fla. Stat. Ann. § 68.083(2).

7

38.     The Florida Department of Legal Affairs, or the Department of Financial Services under certain circumstances, may elect to intervene and proceed with the action, on behalf of the state, within 60 days after it receives both the complaint and the material evidence and information.  Fla. Stat. Ann. § 68.083(3).

The Medicare Program

39.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, known as the federal Medicare program, which authorizes medical benefits for the elderly, blind and disabled. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

40.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

41.     If services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

42.     By falsely billing Medicare, the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

Federal and State Funding for Medicaid

43.     Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396 *et seq*. Medicaid is a jointly funded federal-state program and enables states such as Florida to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services.

44.     Although Medicaid is funded in significant part by the states, the federal government pays a portion of Medicaid costs. In Florida, the federal government pays for approximately 53 percent of all Medicaid healthcare services, while the State of Florida funds the remaining 47 percent. Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Florida FCA.

The Anti-Kickback Statute

45.     In 1972, Congress enacted the federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by the federal government.

46.     The AKS also provides that those who knowingly and willfully solicit or receive, offer or pay anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a- 7b(b)(1).

47.     The AKS covers any such arrangement where at least one purpose of the remuneration was to pay for the referral of services or to otherwise induce referrals.

48.     A violation of the AKS is a basis for False Claims Act liability.  31 U.S.C. §3729-3733 and 42 U.S.C. §1320a–7b(g).

49.     Compliance with AKS is a condition material to payment from Medicare and/or Medicaid.

50.     The purpose of the AKS is to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than the cost, quality of care or necessity of services.

51.     The AKS seeks to prevent overutilization, limit costs, preserve freedom of choice and preserve competition in health care services. Therefore, complying with AKS is essential to protecting Medicare and Medicaid, and compliance is material to payment from and participation in government-funded health care programs.

52.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

53.     AKS contains a number of safe harbors that outline how an arrangement may be excluded from the application of the AKS. 42 C.F.R. 1001.952.

54.     In order to qualify for a safe harbor, however, a party has to meet all of the specific requirements of that safe harbor.

55.     The safe harbors include the ambulatory surgical center ("ASC") safe harbor (42 CFR 1001.952(r)), the employee safe harbor (42 CFR 1001.952(i)), and the professional services management contracts safe harbor (42 C.F.R. § 1001.952(d)).

56.     The ambulatory surgical center safe harbor applies to an investment return on surgery services performed at ASCs.  42 CFR 1001.952(r).

57.     Under the ASC safe harbor there are four, slightly different scenarios: (1) Surgeon-Owned ASCs, (2) Single-Specialty ASCs, (3) Multi-Specialty ASCs, and (4) Hospital/Physician ASCs.  42 CFR 1001.952(r)(1-4).

58.     Each of the preceding arrangements have similar core requirements: they must not be related to volume or value of referrals, no loans or loan guarantees by other investors are allowed, distributions must be directly proportional to the amount of the capital investment of that investor, ancillary services must be directly and integrally related to primary procedures performed at the ASC and none may be separately billed to Medicare, they must treat Medicare patients in a nondiscriminatory manner, and patients must be fully informed of the physician's ownership.  42 CFR 1001.952(r).

59.     The ambulatory surgical center safe harbor does not apply to investment returns on anesthesia service profits (*See* 42 C.F.R. § 416.2) because anesthesia services are not surgical services.  *See* 42 C.F.R. §§ 416.2 and 416.164(c).

60.     The employee safe harbor applies to any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment

in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. 42 CFR 1001.952(i).

61.    The professional services management services safe harbor (42 CFR 1001.952(d)) is similar to the employee safe harbor but applies to non-employee agents if its seven criteria are met:

a) The agency agreement is set out in writing and signed by the parties;

b) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent;

c) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals;

d) The term of the agreement is for not less than one year;

e) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs;

   f)   The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law; and

   g)   The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

62.    Importantly, the employee safe harbor and the professional services management services safe harbor only apply to the compensation paid to the employee or manager and do not apply to investment returns on anesthesia service profits received by the owners.

63.    The Group Practice Safe Harbor of the AKS excludes from the definition of remuneration any payment that is a return on an investment interest, such as a dividend or interest income, made to a solo or group practitioner investing in his or her own practice or group practice if the following four standards are met:

   a)   Equity interest in the group practice is held by licensed physicians who practice in the group practice as defined by the Stark Law;

   b)   Equity interest must be in group practice itself and not in a subdivision of it;

   c)   The group practice (or subdivision providing ancillary services) meets the Stark Law definition of a group practice/ancillary services of the group practice; and

   d)   The group practice (or subdivision providing ancillary services) must be a unified business with centralized decision-making, pooling of expenses, and a

compensation system that is not based on satellite offices operating substantially as if they were separate enterprises or profit centers.

64.     Under the Stark Law, a group practice is a group of physicians in which each group physician, whether shareholder or employee:

a) Provides substantially the full range of services that such physician routinely provides utilizing the resources of the group;

b) Provides, bills and collects for substantially all services through the group;

c) Shares expenses and income from the practice which are distributed in accordance with predetermined methods;

d) Does not receive, directly or indirectly, compensation based on the volume or value of the physician's referrals, except through a permitted profit sharing or productivity bonus arrangement;

e) Personally conducts at least 75% of the group's physician-patient ☐encounters in the aggregate in the practice, and

f) Meets other regulatory standards.

65.     Further, under the Stark Law, for anesthesia to be an "ancillary service" of the group practice from which the owners of the group practice can derive revenue, it must:

a) Be provided in the same building (same street address) where the medical services are routinely delivered.

b) The services must be furnished personally by the referring physician member of the group or personally by individuals who are generally or directly supervised by the referring physician or another physician in the group.

c) The services must be billed by the physician performing or supervising the services, or a group practice of which such a physician is a member under a billing number assigned to the group practice, or an entity that is wholly owned by such physician or group practice.

66.     The group practice safe harbor does not apply because, while the physician owners may have their own separate group practices, the ASC entity that receives other compensation does not meet the definition of a group practice under the Stark Law.

OIG Advisory Opinion No. 12-06 on AKS Safe Harbors

67.     The Office of Inspector General recently addressed a proposed arrangement for anesthesia services similar to the ones orchestrated by Defendants. See OIG Advisory Opinion No. 12-06, Proposal B.

68.     The OIG opinion addressed an arrangement where the owners of the ASC were also the owners of the entity providing the anesthesia services in the ASC. The anesthesia company was run by an anesthesiologist who charged the ASC a flat rate for its services pursuant to a contract with the ASC. The owners of the ASC retained the profits from the operations of the anesthesia entity after it paid out the anesthesiologist. This is commonly referred to as the "company model" in the anesthesia services sector.

69.     Under the company model, the ASC refers its patients to the anesthesiology company while the ASC owners are also owners of the anesthesiology company or derive profits therefrom.

70.     In exchange for those referrals, the ASC owners take a kick back from the anesthesiology company under the guise of "profit" for those services.

71.     In that opinion, the OIG stated that it has "long been concerned about the potential for investments in ASCs to serve as vehicles to reward referrals."

72.     Moreover, the OIG found that no safe harbors would apply to the profits the physician owners were receiving from the anesthesia services.

73.     Therefore, Defendants use of the company model created an illegal kickback scheme in violation of the AKS.

74.     Compliance with the AKS is a condition material to payment from Medicare and/or Medicaid.

75.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

76.     As stated above, if services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

77.     In billing Medicare and Medicaid for reimbursement when conditions for payment were not met the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

78.     Approximately 20% of the procedures performed by the Defendants were reimbursed from government payers.

## GENERAL ALLEGATIONS

79.     At all relevant times, Orlando Endoscopy was doing business under the name of the two ASCs and was owned jointly as follows: 51% of both are owned by Amsurg Corp. and 49% of both are owned by the CFSC who perform surgeries at the centers.

80.     The Florida Secretary of State lists the directors and/or officers of Defendant CENTRAL FLORIDA SURGICAL CENTERS, INC. as: Alex Menendez, Kenneth R. Feuer, Steven Brint, Robert Baker, Richard Dumois, and Avanish Aggarwal ("GI Docs").

81.     Defendants perpetrated two fraudulent schemes (detailed further below)—the Joint Venture Scheme (hereafter "Joint Venture Scheme") and the In-House Joint Venture Scheme (hereafter the "In-House Scheme")—that involve the payment of kickbacks in exchange for the referral of patients.

Joint Venture Scheme

82.     In or around 2008, the CFSC and AHP LLC formed a joint venture under which Relator states that AHP LLC held 51% ownership and the CFSC held 49% ownership (split equally among the GI Docs).

83.     AHP LLC managed the joint venture and paid Relator and other anesthesia personnel a flat salary to provide anesthesia service to the ASCs.

84.     During this time, AHP LLC had its medical professionals assign their billing rights to AHP LLC and then it billed the government directly for the anesthesia services.

85.     Under the Joint Venture Scheme, AHP LLC personnel would provide exclusive anesthesia services to the ASCs and AHP LLC would share the revenue generated from the billing of such services with the ASCs in exchange for the exclusive referral of patients.

86.     This sharing of revenue constitutes an illegal kickback meant to incentivize the ASCs to use AHP LLC exclusively for anesthesia services.

87.     Relator states that each of the GI Docs, in one particular year, received $181,000 from the anesthesia services provided by AHP LLC as indicated on Schedule K-1 tax forms.

88.     Relator believes that this income was characterized as investment income for tax purposes.

89.     AKS's ASC safe harbor applies to investment returns on surgery services performed at ASCs but does not apply to investment returns on anesthesia service profits.  See OIG Advisory Opinion 12-06, 42 C.F.R. §§ 416.2 and 416.164(c).

90.     Relator learned that the aforementioned payments stopped after OIG Advisory Opinion 12-06 was released addressing the illegal nature and problems with anesthesia service providers making payments to ASC owners in exchange for the right to bill for services.

91.     AHP LLC stopped making payments to the GI Docs for one full year while the GI Docs sought multiple legal opinions regarding how to re-arrange the relationship in another way so they could still get paid for referring anesthesia services.

92.     Relator understands that whatever arrangement that was devised was vetoed by ASC co-owner Amsurg Corp. because AmSurg Corp. wanted to establish its own in-house kickback scheme.

In-House Scheme

93.     In or around July of 2013 AHP LLC stopped performing anesthesia services at the ASCs altogether.

94.     Also around July of 2013 AMSURG entered into a joint venture with the GI Docs similar to the arrangement between AHP LLC and the GI Docs.

95.     Under the In-House Scheme Amsurg Corp. hired the anesthesia services personnel directly onto their payroll (at a significantly lower rate than the rate in effect under the AHP LLC arrangement) to provide exclusive services for the ASCs.

96.     The difference between the low cost of the in-house anesthesia services and the revenue generated is significant and the owners of the ASCs retain the profits.  Amsurg Corp. collects the profits from the anesthesia service providers and gives a portion to the GI Docs.

97.     This sharing of revenue constitutes an illegal kickback paid in return for the ASCs exclusive use of Amsurg Corp. personnel for anesthesia services.

98.     Upon information and belief, Defendant AMSURG has instituted the same or similar scheme with physicians at other surgery centers around the country.

## DAMAGES TO THE UNITED STATES

99.     If services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

100.    By falsely billing Medicare and Medicaid, the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

101.    A significant percentage of the procedures performed by the defendants were reimbursed from government payors, such as Medicare and Medicaid.

102.    Under the federal False Claims Act those who knowingly and willfully make or cause to be made any false statement or representation of a material fact in any application for any benefit or payment from the federal government is liable for a civil penalty of not less than $5,500 and not more than $11,000 per occurrence, plus three times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a).

103.    Upon information and belief, Relator believes that over $1.5 million has been paid by the Government for anesthesia services alone at those two ASCs where kickbacks were being paid.

104.    The ASCs additionally received payments for surgery services provided at the same time.

105.    Relator believes that approximately 20% of patients at the ASCs received services that were reimbursed by Government programs.

## COUNT ONE
## FALSE CLAIMS ACT - PRESENTATION OF FALSE CLAIMS

106.    Relator incorporates and re-alleges paragraphs 1 through 106 as if fully set forth herein.

107.    In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

108.    The United States of America, in reasonable and justified reliance on the purported accuracy of these certified false and fraudulent claims by Defendants, paid and continues to pay for medical services and products allegedly provided to individuals insured by Medicare and Medicaid.

## COUNT TWO
## FALSE CLAIMS ACT - FALSE STATEMENTS

109.    Relator incorporates and re-alleges paragraphs 1 through 109 as if fully set forth herein.

110.    In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

111.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments that resulted in its being damaged in an amount to be determined.

## COUNT THREE
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

112.    Relator incorporates and re-alleges paragraphs 1 through 112 as if fully set forth herein.

113.    Under the Florida False Claims Act, in effect prior to July 1, 2013, Defendants, in performing the acts described above, acting in concert and/or through their own actions or through the acts of their officers and/or agents, have knowingly violated:

a)    Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval and/or; □

b)    Fla. Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

114.    Under the Florida False Claims Act, as amended and effective July 1, 2013, Defendants, in performing the acts described above, acting in concert and/or through their own actions or through the acts of their officers and/or agents, have knowingly violated:

a)    Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval and/or;

      b) Fla. Stat. § 68.082(2){b) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.

115.      The State of Florida, unaware of the foregoing circumstances and conduct of the Defendants, made full payments that resulted in it being damaged in an amount to be determined.

**PRAYER FOR RELIEF**

WHEREFORE, RELATOR respectfully requests that this Court enter judgment against Defendants as follows:

a.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

b.    That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented and/or payment the Defendants wrongfully avoided paying to the United States;

c.    That pre- and post-judgment interest is awarded, along with reasonable attorney's fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

d.    That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That the State of Florida be awarded damages in the amount of three times the damages sustained by the State of Florida because of the false claims alleged in this Complaint, as the Florida False Claims Act provides;

f. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the State of Florida Medicaid Program;

g. That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Florida False Claims Act;

h. That Relaters be awarded the maximum amount allowed pursuant to the Florida False Claims Act; and,

i. That this Court award such other and further general, equitable, and legal relief as it deems just and proper.

## DEMAND FOR A JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

Respectfully Submitted,

Date: February 5, 2016

_____

J. Marc Vezina, Esq.
   LA Bar No. 24683
   TX Bar No 24000141
   GA Bar No. 465449
   MI Bar No. P76232
Monica P. Navarro (MI Bar No P52985)
VEZINA LAW, PLC
Attorneys for Relator
280 N. Old Woodward Ave, Suite LL20
Birmingham, MI 48009
Office: (248) 558-2700
Fax: (248) 232-1581
jmv@vezinalaw.com
mnavarro@vezinalaw.com

_____

**Kevin J. Darken**
Florida Bar No. 0090956
kdarken@tampalawfirm.com
THE BARRY A. COHEN LEGAL TEAM
201 East Kennedy Boulevard, Suite 1950
Tampa, Florida 33602
Telephone: (813) 225-1655
Facsimile:  (813) 225-1921
*Attorney for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Relator's Unopposed Motion to Seal Pursuant to 31 U.S.C. §3730(b)* has been furnished by hand-delivery to **Lee Bentley,** United States Attorney, United States Attorney's Office, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602 and by Federal Express to **Loretta E. Lynch,** United States Attorney General, Dept. of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-0001; **Pam Bondi,** Florida Attorney General, Office of Attorney General, State of Florida, The Capitol PL-01, Tallahassee, FL 32399-1050; and **Jeff Atwater**, Florida Chief Financial Officer, Office of the Chief Financial Officer, Florida Department of Financial Services, 200 East Gaines Street, Tallahassee, FL 32399-0301 on this 5th day of February, 2016.

Kevin J. Darken